IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ROBERT GULLACE,                         )
                                        )
                   Plaintiff,           )
                                        )
v.                                      )     Civil Action No. 1:11cv0755 (TSE/JFA)
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
                   Defendant.           )
_____ )

## REPORT AND RECOMMENDATION

This matter is before the undersigned Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment.

(Docket no. 11).[1]  Pursuant to 42 U.S.C. § 405(g), plaintiff Robert Gullace seeks judicial review

of the final decision of Michael J. Astrue, Commissioner of the Social Security Administration

("SSA"), denying his application for Disability Insurance Benefits ("DIB") under Title II of the

Social Security Act ("the Act"), 42 U.S.C § 401, *et seq*.[2]  The Commissioner's final decision is

based on a finding by the Administrative Law Judge ("ALJ") that plaintiff is not disabled as

defined by the Act and applicable regulations.

For the reasons discussed below, the undersigned recommends that plaintiff's motion for

summary judgment (Docket no. 14) be denied; the Commissioner's motion for summary

judgment (Docket no. 12) be granted; and the Commissioner's final decision be affirmed.

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Docket nos. 9, 10). In accordance with these rules, this Report and Recommendation excludes any personal identifiers such as plaintiff's social security number and his date of birth (except for year of birth) and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

[2] Plaintiff did not file a claim for Supplemental Security Income payments. *See* AR 98.

## PROCEDURAL HISTORY

**SSA Proceedings**

Plaintiff filed a claim for DIB on August 27, 2007 claiming his disability began on March 2, 2007. (Administrative Record ("AR") 62, 98-101). Plaintiff initially alleged a disability within the meaning of the Act due to his (1) bipolar disorder; (2) attention deficit hyperactivity disorder; (3) amnestic disorder; (4) cognitive disorder; (5) reading disorder; (6) obsessive compulsive adjustment disorder; (7) high blood pressure; (8) high microalbumin and protein in his urine; and (9) prior knee injury. (AR 98, 112, 121, 128).

Plaintiff's initial claim was denied by the SSA Regional Commissioner on January 15, 2008.[3] (AR 71-74). On January 28, 2008, plaintiff appointed attorney Stephen F. Shea as his representative in connection with his DIB claim. (AR 76). On January 31, 2008, plaintiff sought reconsideration of the Regional Commissioner's denial, arguing that his mental health impairments were unpredictable and spontaneous and that his past education and work record did not mitigate those impairments. (AR 77-78). The Regional Commissioner denied the request for reconsideration on April 9, 2008 after considering additional reports received on March 13 and April 4, 2008 from Carol Geer-Williams, Ph.D and Mirza Baig, M.D.[4] (AR 79-80).

On April 21, 2008, plaintiff requested a hearing before an ALJ. (AR 62). Plaintiff's request was acknowledged on April 29, 2008 and a hearing before an ALJ was set for August 5, 2009. (AR 82-89, 42). On August 5, 2009, plaintiff and his counsel appeared before ALJ Robert W. Young. (AR 9-41). At the hearing, plaintiff testified and exhibits 1A through 25F were

---

[3] Initial and reconsideration reviews are performed by an agency of the state government (the Disability Determination Services ("DDS"), a department of the Maryland Division of Rehabilitaion Services) under arrangement with the SSA. 20 C.F.R. Part 404, Subpart Q; *see also* § 404.1503. Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal SSA.

[4] In portions of the Administrative Record Dr. Baig is referred to as M H Ali Baig, M.D.

2

made part of the record. (AR 11-33). Anthony Melanson, a vocational expert, also testified at the hearing and was questioned by the ALJ and plaintiff's counsel. (AR 33-39, 95-96).

On November 3, 2009, the ALJ issued a decision in which he concluded that plaintiff had not been under a disability within the meaning of the Act from March 2, 2007 through the date of the decision. (AR 59-70). On November 4, 2009, plaintiff requested a review of the decision issued by the ALJ. (AR 8). The Appeals Council denied the request for review on May 20, 2011. (AR 1-5). The Appeals Council's denial of plaintiff's request rendered the ALJ's decision the final decision of the Commissioner for purposes of review under 42 U.S.C. § 405(g).

**Proceedings in this Court**

On July 18, 2011, plaintiff filed a civil action for review of the Commissioner's final decision. (Docket no. 1). It appearing from the record that service had not been effected within 120 days of the filing of plaintiff's complaint, on November 21, 2011 the Court ordered plaintiff to show cause why the case should not be dismissed pursuant to Fed. R. Civ. P. 4(m). (Docket no. 3). On December 6, 2011, plaintiff filed a response to the Court's Order accompanied by two affidavits from plaintiff's counsel verifying that service was effected on the Commissioner and the Attorney General of the United States on October 3, 2011 and on the Civil Process Clerk of the Office of the United States Attorney for this District on October 11, 2011 (*i.e.*, within 120 days of the filing of plaintiff's complaint). (Docket nos. 4-6).

The Commissioner filed an answer to plaintiff's complaint on December 9, 2011 (Docket no. 8) along with the Administrative Record (Docket nos. 9, 10). On December 14, 2011, the Court entered an Order stating that the case was appropriate for disposition on cross-motions for summary judgment and directing any party who wished to file a motion for summary judgment to do so within 30 days of the Order with responses due 11 days thereafter. (Docket no. 11).

3

The Court also stated that a request for oral argument must be filed with any motion for summary judgment or response to a motion for summary judgment filed by the parties. (*Id.*).

On January 13, 2012, the Commissioner filed a motion for summary judgment along with a memorandum in support (Docket nos. 12, 13) and plaintiff filed a motion for summary judgment along with a memorandum in support (Docket nos. 14, 15). On January 24, 2012, the Commissioner filed his opposition to plaintiff's motion for summary judgment. (Docket no. 16). Plaintiff did not file an opposition to the Commissioner's motion for summary judgment. Neither party has requested oral argument on their motion for summary judgment.

## FACTUAL BACKGROUND FROM THE ADMINISTRATIVE RECORD

### Plaintiff's Age, Education, and Relevant Employment History

Plaintiff was born in 1955. (AR 98). Plaintiff received a Bachelor's Degree in accounting in 1995 and then worked as an auditor for the Office of Personnel Management ("OPM") prior to retirement on March 2, 2007, the date of his alleged disability. (AR 14, 16, 18, 19, 113, 173).

### Chronology of Plaintiff's Medical Records from the Administrative Record

On August 27, 2004, plaintiff began psychotherapy with Carol Geer-Williams, Ph.D. (AR 392-395, 400). Plaintiff initially complained of anger and irritability after he was denied a promotion within OPM, having been told that his poor writing and analytical skills as well as problems getting along with coworkers adversely affected his work performance. (*Id.*). Dr. Geer-Williams initially diagnosed plaintiff with an adjustment disorder with mixed anxiety and depressed mood and recommended neuropsychological testing to determine if plaintiff in fact suffered from deficits in his writing abilities. (*Id.*). Plaintiff has seen Dr. Geer-Williams on a regular basis since August 2004. (AR 361-423, 528, 548-551).

On January 28, 2005, Arthur Horton, Jr., Ed.D. ABPP, ABPN completed a neuropsychological evaluation of plaintiff and found that plaintiff had verbal, non-verbal, and composite intelligence indices all within the average range and high average spelling, average math, and low average reading skills. (AR 226, 229-30). Dr. Horton observed that plaintiff was bilaterally impaired with tactile perceptual functioning, speech sounds perception, and rhythmetric pattern discrimination; that he was consistently impaired with the right hand on motor strength and speed, though his visual tracking test scored in the unimpaired range; and that his visual/organizational skills were mildly impaired. (AR 230). Dr. Horton also observed that plaintiff had generally adequate language abilities and that he demonstrated a moderate degree of impairment regarding abstract concept formation and cause-and-effect relationship understanding. (AR 230-31). Dr. Horton noted that plaintiff also indicated symptoms in the bipolar range, though he stated that the symptoms were only minor. (AR 232).

Overall, Dr. Horton determined that plaintiff functioned in the average range of measured intellectual abilities and diagnosed attention deficit disorder based on his evaluation of plaintiff's attention/memory functions, as well as amnestic disorder, cognitive disorder, reading disorder, and, like Dr. Geer-Williams before him, adjustment disorder with mixed anxiety and depressed mood. (AR 231-32). Dr. Horton recommended psychiatric treatment, medication, and additional educational evaluation and instruction, as well as neuropsychological reevaluation in two years. (AR 233-34). Dr. Horton also made a number of recommendations regarding how plaintiff might manage his work and social lives given his conditions, and again reiterated his recommendation of educational improvement of plaintiff's reading skills given the nature of his day-to-day duties as an OPM auditor. (AR 235-36).

5

Beginning in May 2005, plaintiff underwent a course of treatment with Robert S. Viener, M.D. for discomfort in his right knee. (AR 248-257). On May 27, 2005, Dr. Viener noted that plaintiff had a history of an anterior cruciate ligament tear in 1987 and underwent reconstruction in 1990. (AR 256). An x-ray confirmed tricompartmental osteoarthritic change with the two interference screws in the satisfactory position. (*Id.*). Plaintiff's knee was injected with Xylocaine, Marcaine and Kenalog and plaintiff was prescribed Relafen. (*Id.*). When plaintiff returned in March 2006 he reported that he got excellent benefit from the previous injection that lasted several months but the symptoms had resumed recently. (AR 254). Plaintiff was examined, his knee was x-rayed, and Dr. Viener prescribed Darvocet and advised plaintiff to consider a course of Euflexxa. (*Id.*). Plaintiff received three Euflexxa injections in April 2006. (AR 251-253). At a follow-up visit in May 2006, plaintiff reported that his symptoms were improved 60-70%, that he had no pain at night or difficulties with daily living, and Dr. Viener noted that there was no effusion, plaintiff had nearly full extension, and there was no joint line tenderness. (AR 250). At another follow-up visit in October 2006, plaintiff again reported a 60-70% improvement in his symptoms and an absence of pain at night, while working, and at rest. (AR 248). Dr. Viener again noted the lack of effusion, nearly full extension, the absence of joint line tenderness, and the absence of pain on range of motion. (*Id.*).

In connection with an EEOC matter involving the plaintiff, Francis Fishburne, Ph.D. (a neuropsychologist) prepared a letter on June 14, 2006 following an interview with plaintiff and one of plaintiff's work supervisors, a review of plaintiff's performance evaluations in his OPM personnel file, Dr. Horton's January 2005 neuropsychological report, and letters from Dr. Geer-Williams. (AR 238-44). Based on that information Dr. Fishburne concluded that beginning in 2004 plaintiff's attention deficit, amnestic, cognitive, reading, and adjustment disorders

negatively affected his ability to perform his current job duties and opined that accommodations
(coaching notes, weekly meetings with his supervisor, and working from home two days a week)
would not enable him to perform at a "Fully Successful" level as an OPM auditor. (*Id.*).

On October 20, 2006, Dr. Geer-Williams wrote a letter on plaintiff's behalf requesting a
reasonable accommodation under the Americans with Disabilities Act from his employer. (AR
403-04). Dr. Geer-Williams stated that plaintiff had "episodes" where it was difficult to
concentrate and work with complex rules and policies and that his symptoms were exacerbated
by "friction" with coworkers and supervisors that further impaired his ability to concentrate.
(AR 403). Dr. Geer-Williams recommended that plaintiff be reassigned to a different position in
a new office within OPM that involved less complex information and procedures and a less
stressful environment. (AR 403-04). Dr. Geer-Williams emphasized "that while Mr. Gullace
does suffer from a disability he is perfectly able to work and be a productive employee for the
right position" and that the effects of his disability were "largely controlled" through treatment,
leaving "only minor and occasional effects to his job performance." (*Id.*).

On December 30, 2006, Dr. Geer-Williams completed a Disability Retirement
Physician's Statement. (AR 400-2). In that Statement, Dr. Geer-Williams reviewed Dr.
Horton's neuropsychological evaluation and noted psychiatrist Dr. Jemima Kankam's diagnosis
of bipolar disorder and prescription of medication for that disorder and the attention deficit
hyperactivity disorder. (AR 400-01). Dr. Geer-Williams also noted Dr. Fishburne's evaluation,
its consistency with her earlier conclusion that plaintiff's cognitive deficits made it very difficult
for him to perform in his current position, as well as plaintiff's professed desire to continue
working. (AR 401). Dr. Geer-Williams also stated that while medication and psychotherapy
"greatly improved" plaintiff's bipolar disorder symptoms, the quality of his work was not

improving and his cognitive deficits were the primary cause of his inability to perform his present job duties ("the complex tasks of a GS-12"). (AR 400-02). Indeed, Dr. Geer-Williams stated that plaintiff "will never be able to perform his job" (an OPM auditor). (AR 402).

Between March 2005 and February 2008, plaintiff was treated by Dr. Kankam, an adult psychiatrist. (AR 324-52, 522-27). On June 13, 2007, Dr. Kankam noted that plaintiff's mood instability was residual and that his anxiety was improving. (AR 345). Observing his mental state, she also noted that his appearance was normal, his thought process was coherent, and that his insight and judgment were good. (*Id.*). Dr. Kankam made no change in plaintiff's diagnosis or treatment. (*Id.*). On August 15, 2007 and October 15, 2007, Dr. Kankam observed that plaintiff's mood instability and anxiety were improving, noted plaintiff's normal appearance, coherence, and fair insight and judgment, made no change in plaintiff's diagnosis, and adjusted his medication on August 15, 2007. (AR 347, 348).

Plaintiff continued treatment with Dr. Geer-Williams, and on March 8, 2008, she completed a general Medical Report at the request of DDS. (AR 362-65). In that report, Dr. Geer-Williams described plaintiff's bipolar disorder and its effects on his job performance and noted that adjustments to his medication decreased the frequency of mood swings but did not stop them completely. (AR 364). Dr. Geer-Williams also reiterated her earlier opinion that despite treatment, plaintiff was "still unable to do his job" (an OPM auditor) and that his cognitive deficits remain consistent. (*Id.*). Dr. Geer-Williams also stated her belief that Drs. Horton and Fishburne had similar conclusions. (*Id.*).

On January 24, 2009, plaintiff began treatment for the pain and swelling in his right knee with Countryside Orthopaedics, P.C. (AR 484-89). Radiological examination revealed general arthritis in all three compartments and diffuse osteophytosis, and an MRI from November 2008

8

indicated severe degenerative arthritis in all compartments and a torn anterior cruciate ligament. (AR 489). Raymond F. Lower, D.O., FAAOS diagnosed significantly advanced post-traumatic degenerative arthritis of the right knee and recommended physical therapy, a sequence of injections, and non-steroidal anti-inflammatory medication. (*Id.*).

Plaintiff received the recommended injections on February 18, February 25, and March 4, 2009. (AR 485-87). In an April 1, 2009 follow-up visit, plaintiff stated that his knee was "doing much better," that he "had no more giving way," and that he was planning to travel to Hawaii that month. (AR 484). Plaintiff's examination revealed that he walked independently without a limp, had minimal effusion, and had full knee motion without discomfort. (*Id.*). As reported in a letter from the physical therapist dated April 30, 2009, plaintiff was discharged from physical therapy after achieving all of the goals of his treatment plan. (AR 490-91). Plaintiff "demonstrated significant improvement in strength," a normal gait, and full muscle strength in his hips, thighs, knees, and lower legs, though his knee did give him some pain descending steps and there remained mild joint line tenderness. (*Id.*).

On July 21, 2009, shortly before plaintiff's hearing before the ALJ, Dr. Geer-Williams again wrote a letter on plaintiff's behalf. (AR 528). In her letter, Dr. Geer-Williams stated that when plaintiff was depressed, his mood, fatigue, low motivation, and poor concentration made it "impossible" for him to work and when manic, his anger and agitation caused inappropriate behavior on the job. (*Id.*). Dr. Geer-Williams also stated that plaintiff was "unable to work," that there had been no significant changes in plaintiff's condition, and that it was "impossible" for plaintiff to work. (*Id.*).[5]

---

[5] The Administrative Record also contains medical records from Dr. Baig (AR 216-225, 424-460) and Dr. Damm (AR 258-67) but those records do not contain any significant relevant information concerning plaintiff's alleged disabilities and therefore are not summarized in this Report and Recommendation.

**Evaluations of Plaintiff for Disability Determinations**

On December 12, 2007, plaintiff submitted to a musculoskeletal evaluation by Doriscine Colley, M.D. (AR 269-74). Dr. Colley observed that plaintiff had full range of motion in his neck, full weight-bearing ability in both legs, a normal gait and cadence, did not require the use of a cane, and was able to bend forward and lift light objects. (AR 273). Dr. Colley also observed that plaintiff had full strength in his upper and left lower limbs and 4 out of 5 strength in his right knee. (*Id.*). Dr. Colley diagnosed plaintiff with a degenerative joint disease of the right knee with some arthritic changes in that knee. (AR 273-74).

On December 24, 2007, Mikhael Taller, M.D. performed a consultative psychiatric evaluation at the request of DDS. (AR 276-83). Dr. Taller observed that plaintiff did not exhibit psychomotor agitation or retardation, that he was cooperative, that he did not feel hopeless, helpless, or guilty, and that he admitted to normal self-esteem and a normal energy, average concentration and memory, average sleep and appetite, and average motivation and interest levels. (AR 277). Dr. Taller also noted that plaintiff's thought processes were goal-directed and coherent, that he was alert and oriented to time, place, and himself, and that his insight and judgment were fair. (AR 278). Dr. Taller diagnosed plaintiff with bipolar disorder in partial remission and attention deficit disorder and noted that plaintiff was competent to manage his financial affairs and that plaintiff's Activities of Daily Living Report was consistent with his medical history and mental evaluation. (*Id.*).

In the Activities of Daily Living Report, plaintiff stated that most of his daily activities (*e.g.*, cleaning, shopping, cooking, maintaining a residence) were done on his own initiative routinely and consistently, though his bipolar disorder and right knee pain did interfere with those activities. (AR 279). Plaintiff stated that he drove, cared for his own personal needs,

shopped for groceries (but not clothes), cleaned his residence with his girlfriend, went out to eat, went to church occasionally, and watched television and read every day. (AR 281). Again, most of plaintiff's daily activities were done independently and on his own initiative. (AR 281-82). Plaintiff also stated that he slept "okay" 6.5 to 7.5 hours each night, occasionally went to public places where he felt comfortable, and occasionally visited friends and relatives. (AR 282). Finally, plaintiff stated that he had an average temper, average concentration and memory, and an ability to follow simple instructions independently. (*Id.*).

On January 10, 2008, Frank Roman, Ed.D. completed a Psychiatric Review Technique form concerning the plaintiff. (AR 286-99). In that form Dr. Roman noted the plaintiff's organic mental disorder of ADHD and affective disorder of bipolar syndrome and found that they are "not severe." (AR 286, 287, 289). Dr. Roman indicated that plaintiff's degree of limitation was "mild" for restriction of activities of daily living, difficulties in maintaining social functions, and difficulties in maintaining concentration, persistence, or pace. (AR 296).

On January 15, 2008, S.K. Najar, M.D. completed a Physical Residual Functional Capacity Assessment of the plaintiff. (AR 315-22). Dr. Najar noted that plaintiff reports he drives, shops, prepares simple meals, and does light household chores and that his gate, station, and range of motion are normal. (AR 317, 320). Dr. Najar found that plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (AR 317-19). As to exertional limitations, Dr. Najar noted plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and had no limitations on push and/or pull. (AR 316).

On March 26, 2008, D. Walcutt, Ph.D completed a Psychiatric Review Technique Form ("PRTF") and a Mental Residual Function Capacity Assessment following a review of the

medical evidence in the record at that time and determined that plaintiff's attention deficit

hyperactivity, reading, cognitive, adjustment, and bipolar disorders did not meet or medically

equal any of the listed impairments in the applicable SSA regulations. (AR 461- 80). Dr.

Walcutt determined that there were mild functional limitations that restricted plaintiff's activities

of daily living and moderate functional limitations that restricted plaintiff's ability to maintain

social functioning and concentration, persistence, or pace. (AR 473). Dr. Walcutt took note of

plaintiff's progress notes from February 2008, specifically plaintiff's responsiveness to

medication to manage his mood swings and cognitive deficits and the fact that his mood was

observed to be stable and his agitation under control. (AR 475). Dr. Walcutt also noted Dr.

Taller's diagnosis of bipolar disorder in partial remission and the findings from Dr. Horton's

neuropsychological evaluation. (*Id.*).

In his Summary Conclusions, Dr. Walcutt found that plaintiff had only moderately

limited abilities to understand, remember, and carry out detailed instructions; maintain attention

and concentration for extended periods; perform activities within a schedule, maintain regular

attendance and be punctual; work in coordination with or proximity to others without being

distracted; complete a normal workday and workweek without interruptions from

psychologically based symptoms; and perform at a consistent pace without an unreasonable

number or length of rest periods. (AR 477-78). Dr. Walcutt also found that plaintiff had

moderately limited abilities to interact with the general public; accept instructions and respond

appropriately to criticism from supervisors; get along with coworkers and peers; maintain

socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond

appropriately to changes in the work setting; and set realistic goals and make plans

independently of others. (AR 478). In all other areas, Dr. Walcutt's Summary Conclusions

12

noted no significant limitations. (AR 477-78). Dr. Walcutt noted in his Functional Capacity

Assessment that plaintiff's social limitations were due to his irritability but that plaintiff was

capable of "negotiating" in the community. (AR 479). Dr. Walcutt concluded that plaintiff's

residual functional capacity ("RFC") "appears compatible with work-related functions equated

with competitive employment." (*Id.*).

### PROCEEDING BEFORE THE ALJ AND LATER-SUBMITTED EVIDENCE

### Hearing before the ALJ – Plaintiff's Testimony

On August 5, 2009, plaintiff and his counsel appeared before the ALJ. (AR 9-41).

Plaintiff testified that his was 6 feet tall and weighed approximately 220 pounds, that he had

been divorced for 15 years, and that he had lived with his girlfriend in her second-floor

condominium in Ashburn, Virginia since November 2008. (AR 12-13). Plaintiff also testified

that from March 2007 until November 2008, he and his girlfriend lived in a two-story house in

Crofton, Maryland, and before that he lived alone in a second-floor apartment in Laurel,

Maryland. (AR 13-14).

Plaintiff testified that he could read and write and that he earned a degree in accounting in

1995. (AR 14-15, 18). Plaintiff also testified that he previously received worker's compensation

and that he currently receives Federal Employees Retirement System disability benefits. (AR

15-16). Plaintiff went on to testify that he was last employed as an auditor in the Office of the

Inspector General at OPM, a position he began in October 1998. (AR 16). Before working for

OPM, plaintiff testified that he worked in the mailroom and as a file clerk in the claims

department at an insurance company until he had knee surgery in 1990. (AR 16-18, 19, 23).

Plaintiff testified that when he worked in the mailroom, he occasionally lifted 20 pounds or more

and "did a lot of bending." (AR 18).

On examination by his counsel, plaintiff testified that he retired from OPM because of difficulties in his relationships with his coworkers and his ability to complete his work duties within the appropriate time given his trouble concentrating for more than an hour at a time. (AR 19-21). Plaintiff also testified that even with supervision and the ability to work at home one day a week his performance evaluations were still unsatisfactory. (AR 21). Plaintiff further testified that he applied for retirement disability from OPM in anticipation of his termination. (AR 22).

Plaintiff testified that since his retirement from OPM his ability to complete tasks in a timely manner had not changed. (AR 22). Plaintiff testified that he is not very social and that when he did leave his house he is "usually out for maybe a half hour and then I come back in." (AR 23).

Plaintiff testified that his 1990 knee surgery made it difficult to stand for longer than an hour or an hour and a half each day and that while he did suffer from some related pain and arthritis, injections, and ibuprofen provided some relief. (AR 23-24). Plaintiff also testified that if he sat too long – for instance while on an airplane – his knee became stiff, requiring him to "shake it off work it or walk it a little bit," sometimes with a cane. (AR 24).

Plaintiff testified that he was sometimes forgetful and that sometimes he needed to be reminded by his girlfriend to do household chores. (AR 25). Plaintiff testified that his girlfriend was responsible for the shopping, cooking, and cleaning, and that he would rarely do laundry. (AR 25, 30-31). Plaintiff testified that this had been the state of things since 2007, the year he allegedly became disabled, and that it might be attributable to his medication, though he denied suffering from any side effects. (AR 25). Plaintiff testified that he was taking medication for his bipolar disorder and high blood pressure, and that while he still suffered from manic episodes and occasional bouts of depression, his bipolar medication "leveled" him out. (AR 26). Plaintiff

went on to testify that he was "holding [his] own on taking the medication" and that he had "good days and bad days." (AR 27). Describing his manic episodes, plaintiff testified that he repeated things or belabored issues for one or two days a week to the consternation of his girlfriend, who occasionally attended plaintiff's sessions with his psychiatrist and psychologist. (AR 27-28).

On examination by the ALJ, plaintiff testified that one or two days a week he would drive to get a cup of coffee and read a newspaper and that he drove to his doctors' appointments, the store, and the weekly meeting of his bipolar disorder support group, which lasted between an hour and an hour and a half. (AR 28-30). Plaintiff also testified that he did some light gardening, watched some television, and attended church until December 2007. (AR 29-30). Plaintiff further testified that he dressed, shaved, and bathed himself, that he could walk on a level surface for up to an hour and a half, that he could bend and stoop, and that he could lift 10 pounds. (AR 32). Finally, plaintiff testified that he traveled to Hawaii for two weeks in April 2009 where he did some walking. (AR 33).

**Hearing before the ALJ – Vocational Expert's Testimony**

At the hearing, SSA Certified Vocational Expert Anthony Melanson testified without objection from plaintiff. (AR 34-36, 95-96). Prior to his testimony Mr. Melanson had an opportunity to the review the evidence in the record and he heard the plaintiff's testimony. (AR 34). At the ALJ's request, Mr. Melanson classified plaintiff's work as an OPM auditor as "light"[6] and "skilled." (*Id.*). The ALJ posed a hypothetical question to Mr. Melanson in which

---

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

he described a person of plaintiff's age, education, and past work experience with no exertional limitations and the nonexertional limitations[7] listed in the Mental Residual Functional Capacity Assessment completed by Dr. Walcutt; the ALJ excluded frequent interaction with coworkers and the public ("Hypothetical One"). (AR 34-35, 477-80). The ALJ asked if this hypothetical individual could perform any jobs. (AR 35). Mr. Melanson answered in the affirmative, stating that the individual could perform work as a housekeeper or a material handler or sorter, both classified as "medium, unskilled" jobs and that there were a significant number of those positions in the local area and nationally. (*Id.*).

The ALJ then added exertional limitations to the previous hypothetical: lifting 20 pounds occasionally and 10 pounds frequently and occasionally stooping and climbing. (AR 35). The ALJ also added nonexertional limitations, confining the work to routine, repetitive, unskilled tasks and limiting the hypothetical individual to little interaction with coworkers and the public ("Hypothetical Two"). (*Id.*). Mr. Melanson responded that such an individual could work as an entry-level file clerk or a non-government mailroom clerk, both classified as "light, unskilled" jobs and that there were significant numbers of those jobs locally and nationally. (AR 35-36). Mr. Melanson also testified that the abilities of these two hypothetical individuals to perform the work of a housekeeper, material handler or sorter, entry-level file clerk, and non-government mailroom clerk were consistent with the descriptions of those jobs in the U.S. Department of Labor's *Dictionary of Occupational Titles*. (AR 36).

---

[7] Exertional limitations of a claimant's impairment(s) "affect only [the claimant's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)" while nonexertional limitations "affect only [the claimant's] ability to meet the demands of jobs other than the strength demands." Examples of nonexertional limitations include difficulty functioning due to anxiety or depression, difficulty paying attention, remembering detailed instructions, tolerating some physical feature of certain work settings, or performing manipulative or postural functions. 20 C.F.R. § 404.1569(a).

Plaintiff's counsel asked Mr. Melanson to add to both Hypothetical One and Hypothetical Two the additional limitation of poor concentration; counsel then asked whether that additional limitation would have an impact on the hypothetical individual's ability to perform the occupations previously identified. (AR 36). Mr. Melanson replied that if "poor" equated to an 18-20% loss in productivity, then the individual would not be able to perform any substantial gainful activity. (*Id.*).

Plaintiff's counsel then asked Mr. Melanson to add a moderate limitation following simple work rules consistently to both Hypothetical One and Hypothetical Two and asked if that would have any impact on the individual's ability to do any of the previously identified jobs. (AR 36-37). Mr. Melanson again replied that if that limitation equated to an 18-20% loss in productivity – "missing a day-and-a-half, two days a month of work" – the individual could not perform any substantial gainful activity. (AR 37).

Plaintiff's counsel then asked Mr. Melanson to add extra supervision, such as a job coach or someone to review their work on a regular basis, to the limitations already included in Hypothetical One and Hypothetical Two and asked if that would have an impact on the individual's ability to do the identified jobs. (AR 37). Mr. Melanson replied that if extra supervision was needed on a regular basis, the work would be considered sheltered, non-competitive work and the individual would not be able to perform substantial gainful activity. (*Id.*).

Plaintiff's counsel then questioned Mr. Melanson about the reaching, handling, and fingering requirements of the previously identified jobs. (AR 38). Mr. Melanson replied that for the housekeeper, the material sorter, and the non-government mailroom clerk, handling and reaching were frequently required and fingering was occasionally required. (*Id.*). For the entry-

level file clerk, handling and reaching were constantly required and fingering was occasionally required. (*Id.*). When asked if adding the limitation of consistently impaired motor strength and speed in the dominant upper extremity to Hypothetical One and Two would impair an individual's ability to perform any of the previously identified jobs, Mr. Melanson replied that they would not be able to perform these particular jobs if they were "unable to constantly perform this work." (AR 38-39).

In his closing argument, plaintiff's counsel argued that the medical evidence in the record consistently established plaintiff's bipolar disorder and his difficulty motivating himself, concentrating, and following work rules. (AR 40). Plaintiff's counsel argued further that because many of plaintiff's difficulties were "organic" rather than functions of his bipolar disorder, his condition was not likely to change. (*Id.*). Plaintiff's counsel asserted in conclusion that plaintiff's limited ability to complete tasks, concentrate, and follow work rules "eliminate[d] work" and therefore an award of benefits was appropriate. (*Id.*).

**Evidence Submitted Following the Hearing before the ALJ and before the Decision**

On August 18, 2009, Dr. Maha Abdel-Kader, a psychiatrist, completed a Psychological Assessment and Mental Residual Functional Capacity Assessment similar to the one completed in March 2008 by Dr. Walcutt. (AR 538-46). Unlike Dr. Walcutt, Dr. Abdel-Kader indicated that plaintiff had moderate to moderately severe limitations on his understanding, memory, concentration, persistence, social interaction, and adaptation. (AR 543-45). Dr. Abdel-Kader indicated severe limitations on plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number or length of rests, and to respond appropriately to unexpected changes in the work setting. (AR 544-45). Dr. Abdel-Kader also checked that several work-

related stressors would "in all likelihood increase the level of impairment" in these areas. (AR 545). Dr. Abdel-Kader also checked that a routine, repetitive, simple, entry-level job would actually serve as a stressor that would exacerbate plaintiff's psychological symptoms rather than mitigate workplace stress. (AR 546). The Administrative Record that was before the ALJ did not contain any notes of Dr. Abdel-Kader's treatment of the plaintiff and unlike Dr. Walcutt, Dr. Abdel-Kader did not provide any discussion or summary analysis of the indications contained in her report.

## ALJ Decision Finding Plaintiff Is Not Disabled

In his decision of November 3, 2009, the ALJ found that plaintiff had the RFC to perform light, unskilled work as defined in 20 C.F.R. § 404.1567(b), but that plaintiff could only occasionally stoop and climb and was limited to routine, repetitive, unskilled tasks with little interaction with coworkers and the public.[8] (AR 66-68). In making this finding, the ALJ considered plaintiff's symptoms and the extent to which they could reasonably be accepted as consistent with objective medical and other evidence contained in the record, following the two-step credibility analysis promulgated by the Court of Appeals for the Fourth Circuit in *Craig v. Charter*, 76 F.3d 585, 594 (4th Cir. 1996). (AR 66-68). The ALJ found that plaintiff's mental and physical impairments could reasonably be expected to cause his alleged symptoms, including his difficulties interacting with coworkers, concentrating, writing audit reports and meeting OPM workplace standards, remembering, walking and standing, and fingering and grasping with his right hand. (AR 66). However, the ALJ also found that plaintiff's statements

---

[8] The ALJ also determined that plaintiff met the insured status requirements of the Act through December 31, 2011; that plaintiff had not engaged in substantial gainful activity since March 2, 2007, his alleged onset date (step one of the sequential evaluation process); that plaintiff had severe impairments of bipolar disorder, adjustment disorder, attention deficit hyperactivity disorder, reading disorder, cognitive disorder, knee pathology, and hypertension (step two); that plaintiff's severe impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (step three); and that plaintiff was unable to perform his past relevant work as an auditor (step four). (AR 64-68). These specific findings are not contested by either party.

concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were not consistent with his finding – based on the record – that plaintiff could perform light, unskilled work with specific limitations. (AR 67).

While the ALJ found that plaintiff's mental impairments caused limitations and difficulties, plaintiff's testimony that his symptoms did not cause serious limitations and Dr. Taller's psychiatric evaluation did not support a finding that plaintiff could not perform routine, repetitive, unskilled tasks with little interaction with coworkers or the public. (AR 67). The ALJ noted Dr. Taller's opinion that plaintiff's bipolar disorder was in partial remission, his observations of plaintiff's normal self-esteem and energy level and average concentration, memory, sleep, appetite, motivation, and interest levels, as well as his opinion that plaintiff could understand and follow simple instructions independently – all evidence of plaintiff's ability to perform light, unskilled work that was limited to routine, repetitive, unskilled tasks with little interaction with coworkers and the public. (*Id.*).

As to plaintiff's physical impairments, the ALJ found that while the objective medical evidence indicated that his knee caused plaintiff pain when frequently climbing or bending, plaintiff was otherwise pain free and able to regulate his condition with medication and therapy. (AR 67). The ALJ noted plaintiff's 1988 and 1990 surgeries and the resulting degenerative joint disease and severe arthritis in plaintiff's right knee. (*Id.*). The ALJ also considered plaintiff's 2006 follow-up examination, 6 months after completing a course of Euflexxa, where plaintiff reported no pain at night, at work, or at rest and stated that his symptoms were 60-70% improved. (*Id.*). The examination showed that plaintiff had no effusion and nearly full extension and, though the plan included a follow-up in 6 months unless his symptoms worsened, nothing in the record indicated that plaintiff in fact returned for treatment because of worsened symptoms.

(*Id.*).  The ALJ also considered Dr. Colley's examination in December 2007, in which it is noted that plaintiff could bend forward and lift light objects; notes from plaintiff's 2009 therapy sessions indicating that his knee had improved but that he still had pain descending steps; and plaintiff's April 2009 treatment notes indicating that plaintiff's knee was much improved, he could walk independently without a limp, he had full range of motion in his knee without discomfort, and that there was no tenderness to palpation.  (*Id.*).  The Administrative Record also contains a 2008 report from Dr. Najar stating plaintiff could stand, walk and/or sit for 6 hours in an 8-hour workday and had no push/pull limitations.  (AR 316).[9]  The ALJ determined that this evidence was consistent with his finding that plaintiff had the RFC to perform light work with the exertional limitations of only occasional stooping and climbing.  (*Id.*).

The ALJ did not give Dr. Geer-Williams's July 2009 letter stating that it was "impossible" for plaintiff to work significant weight.  (AR 68).  The ALJ noted that Dr. Geer-Williams's statements in that letter were inconsistent with both plaintiff's treatment notes and her October 2006 opinion that plaintiff could in fact work, given the right combination of medication and therapy.  (*Id.*).  The ALJ also afforded the opinion submitted by Dr. Abdel-Kader after plaintiff's hearing less weight as there was no indication that she had a treating relationship with plaintiff; her opinion that plaintiff had marked limitations in concentration, persistence, and pace was inconsistent with both the medical evidence in the record and plaintiff's testimony; and her opinion that plaintiff had moderately severe limitations in his ability to sustain an ordinary routine was inconsistent with the medical evidence in the record indicating that he could in fact function within a basic, repetitive routine.  (*Id.*).

---

[9] The ALJ also considered plaintiff's complaints regarding limitations in his ability to use his hands.  (AR 67).  Noting that the only reference to plaintiff's use of his hands – Dr. Horton's report showing problems with sensation bilaterally – dated from 2005, two years before plaintiff's alleged onset date, and that plaintiff's December 2007 consultative examination found that plaintiff had full grip strength in both his right and left hands, the ALJ found that the record did not support a limitation on plaintiff's ability to use his hands.  (AR 67-68).

**Evidence Submitted Following the Decision of the ALJ[10]**

On January 11, 2010, Dr. Geer-Williams completed a "disability evaluation." (AR 548-51). In addition to recounting plaintiff's mental health background, Dr. Geer-Williams's evaluation introduced new evidence regarding plaintiff's difficulties while he was a university student and an employee of Burger King and Aetna. (AR 548-49). In her summary, Dr. Geer-Williams stated that while plaintiff had "improved marginally with 3 years of medication and psychotherapy," the fact that he chose to retire from OPM on disability rather than face termination "confirm[ed] that no amount of psychiatric treatment or job support would improve the patient's ability to be successful at [his previous] job or any other job that he has had." (AR 551). Dr. Geer-Williams went on to conclude that plaintiff could not work and should be granted disability given the cumulative effects of his cognitive, psychiatric, and social deficits. (*Id.*). Dr. Geer-Williams acknowledged that this position was contrary to her previous opinion in October 2006 that "while Mr. Gullace does suffer from a disability he is perfectly able to work and be a productive employee for the right position" and that the effects of plaintiff's disability were "largely controlled" through treatment, leaving "only minor and occasional effects to his job performance." (*Id.*; *see* AR 403-04). Dr. Geer-Williams offered no medical explanation for this change in her position other than the possibility of not having complete information at the time.

On February 4, 2010, Dr. Abdel-Kader submitted a letter stating that plaintiff had undergone treatment with her for bipolar disorder since December 26, 2008 and that she saw plaintiff regularly to manage his medication.[11] (AR 553). Dr. Abdel-Kader also stated that

---

[10] The Commissioner argues that this post-decision evidence is neither new nor material and should not be considered in deciding whether to remand. (Docket no. 13 at 18-20).

[11] As noted above, apart from the August 18, 2009 Psychological Assessment and Mental Residual Functional Capacity Assessment (AR 538-46), there is no information in the record establishing plaintiff's relationship or course of treatment (if any) with Dr. Abdel-Kader.

plaintiff was unable to perform any work activities involving significant physical or mental activities and that his ability to handle stress was very minimal. (*Id.*).

**DISCUSSION**

**Questions Presented**

The questions presented by these cross-motions for summary judgment are whether the Commissioner's final decision is supported by substantial evidence and whether the Commissioner applied the correct legal standard in denying plaintiff's application for DIB.

**Standard of Review and Applicable Legal Standards**

In reviewing the Commissioner's decision to deny benefits, this Court is limited to determining whether that decision was supported by substantial evidence and whether the proper legal standards were applied in evaluating the evidence. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Substantial evidence is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion; it is more than a mere scintilla but less than a preponderance. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

In order to find whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary.'" *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Perales*, 402 U.S. at 390. While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required in order to determine if a claimant is eligible for benefits. 20 C.F.R. § 404.1520(a); *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the ALJ is supported by substantial evidence on the record.

The first step in the sequence is determining whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. § 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. (*Id.*). If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). At the third step, if the claimant has an impairment that meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for 12 months or results in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. § 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work based on a preliminary assessment of the claimant's RFC[12] and the "physical and mental demands of work [the claimant's] past relevant work." 20 C.F.R. §§ 404.1520(e), (f). If such work can be performed, then benefits will not be awarded.

---

[12] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week or an equivalent work schedule." S.S.R. 96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the record. (*Id.*).

(*Id.*). However, if the claimant cannot perform his past work, the burden shifts to the Commissioner at the fifth step to show that the claimant is capable of performing other work that is available in significant numbers in the national economy, considering the claimant's age, education, work experience, and RFC. 20 C.F.R. §§ 404.1520(f), (g); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Lester v. Schweiker*, 683 F.2d 838, 841 (4th Cir. 1982).

## ANALYSIS

### Plaintiff's Motion for Summary Judgment

Plaintiff argues that the ALJ failed to assess properly his RFC prior to step four of the sequential evaluation process by (1) failing to perform a function-by-function analysis of plaintiff's abilities to perform basic work activities; (2) failing to evaluate properly pertinent evidence; (3) failing to consider an "expanded list of work-related capacities that may be affected by mental disorders" as required by S.S.R. 96-8p; and (4) failing to include plaintiff's limitations on concentration, persistence, and pace in his assessment.[13]  Plaintiff argues that these failures demonstrate that the ALJ's RFC assessment is not supported by substantial evidence and defies review.

Plaintiff first argues that the ALJ determined that plaintiff could perform unskilled, light work without first completing a function-by-function analysis of plaintiff's ability to perform the exertional and nonexertional requirements of unskilled,[14] light work as required by Social Security Ruling 96-8p. (Docket no. 15 at 6).  That ruling provides that the RFC assessment

---

[13] In the opposition to plaintiff's motion, the Commissioner notes that "[p]laintiff does not argue that he cannot perform what the ALJ determined to be his RFC." (Docket no. 16 at 1).

[14] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength.  For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed." 20 C.F.R. § 404.1568(a).

> must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.

Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *7 (S.S.A. 1996). Plaintiff argues that the ALJ failed to identify the evidence on which he relied and failed to set forth a "narrative discussion" of sufficient detail in making his determination that plaintiff was capable of performing routine, repetitive, unskilled tasks with limited interaction with coworkers or the public. (Docket no. 15 at 6). Given this failure, plaintiff argues that the ALJ's decision defies meaningful review. (Docket no. 15 at 7).

Plaintiff next argues that while the ALJ determined that plaintiff's right knee impairment was "severe" at step two of the sequential evaluation process, he failed to consider evidence of that limitation on plaintiff's ability to stand and walk when making his RFC assessment prior to step four. (Docket no. 15 at 7). Plaintiff also argues that the ALJ erred in not mentioning plaintiff's November 2008 MRI examination of his right knee in his assessment, an examination that revealed severe degenerative changes in all three compartments, space narrowing and osteophytosis, and a torn anterior cruciate ligament, as well as the fact that plaintiff was prescribed a cane for ambulation in January 2009.[15] (Docket no. 15 at 7-8). Plaintiff argues that this evidence "could have been determinative of the outcome" of his claim given 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 1, which provides that a person approaching advanced middle age with a high school education or above and no transferrable skills limited to sedentary

---

[15] In his opposition, the Commissioner notes that the ALJ did discuss plaintiff's knee surgery, reports of his improvement following injections of Euflexxa and physical therapy, and plaintiff's full range of motion in his knee and ability to walk independently without a limp. (Docket no. 16 at 4).

work is disabled.[16] (Docket no. 15 at 8). Plaintiff also argues that the ALJ failed to consider Dr.

Walcutt's 2008 findings that plaintiff had moderately limited abilities in several areas and

consequently failed to include any limitations relating to those areas in his assessment.[17]

(Docket no. 15 at 8-9). Plaintiff argues that the ALJ also failed to address Dr. Geer-Williams's

March 2008 Medical Report stating that plaintiff's mental status remained consistent with

continued mood swings and cognitive deficits "too severe to work"; Dr. Horton's January 2005

neuropsychological evaluation identifying plaintiff's impaired tactile perceptual functioning,

speech sounds perception, right hand motor speed and function, abstract concept formation and

understanding of cause-and-effect relationships, attention and memory, and ability to think, solve

problems, and exercise judgment; and Dr. Fishburne's June 2006 report identifying deficits in

plaintiff's verbal memory, reasoning, judgment skills, mental flexibility, reading skills, and

attention.[18] (Docket no. 15 at 9). As the ALJ provided no explanation for "implicitly" rejecting

this pertinent medical evidence, plaintiff argues that his decision was erroneous and defies

review. (Docket no. 15 at 10).

---

[16] In his opposition, the Commissioner notes that plaintiff testified that he could walk from an hour to an hour and a half, notwithstanding his knee injury; similarly, there is no evidence in the record that plaintiff's knee injury impaired his ability to work or that his knee was the reason he decided to retire on disability. The Commissioner notes that at the hearing before the ALJ, plaintiff's counsel stated that he would not "waste [the ALJ's] time . . . argu[ing] about sedentary work . . . given the status of [plaintiff's] knee," not knowing "that he's necessarily reached that point yet." (Docket no. 16 at 4-5).

[17] The Commissioner argues in opposition that plaintiff does not challenge the *weight* given to any of this evidence, and that the ALJ is not required "to complete a function-by-function analysis for every limitation included in a medical source's statement." (Docket no. 16 at 5).

[18] As to Drs. Horton and Fishburne, the Commissioner notes that their evaluations pre-date plaintiff's onset date and need not be discussed by the ALJ. (Docket no. 16 at 6; *see McCormick v. Astrue*, 2010 WL 1740712, at *6 (D. Del. April 30, 2010) (stating that "the Court cannot conclude that the A.L.J. erred in failing to consider Dr. Ruoff's evaluation which predated the disability onset date in this case"); *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1165 (9th Cir. 2008) (stating that "[m]edical opinions that predate the alleged onset of disability are of limited relevance")). Moreover, the Commissioner argues that these evaluations do not support plaintiff's disability claim as neither Dr. Horton nor Dr. Fishburne concluded that plaintiff could not work; rather, at most they demonstrate that plaintiff could not work as an OPM auditor. (Docket no. 16 at 7).

Third, plaintiff argues that the ALJ failed to perform a more detailed assessment of the functional limitations resulting from plaintiff's mental disorders contained in the broad categories found in paragraph C of the adult mental disorders listings in Section 12.00 of 20 C.F.R. Part 404, Subpart P, Appendix 1 and summarized in Part III of the PRTF Dr. Walcutt completed in 2008 (AR 473-74) (*i.e.*, activities of daily living, social functioning, concentration, persistence, or pace, and episodes of decompensation), again as required by Ruling 96-8p.[19] (Docket no. 15 at 10-12). Rather, the ALJ "cumulated" plaintiff's mental impairments into a "less-detailed conclusion" limiting plaintiff to routine, repetitive, unskilled tasks with little interaction with coworkers and the public. (Docket no. 15 at 12).

Finally, plaintiff argues that while the ALJ specifically determined that plaintiff had moderate limitations in his abilities to maintain concentration, persistence, and pace, he failed to consider those limitations in his RFC assessment and his determination that plaintiff could perform "routine, repetitive, unskilled" tasks consequently does not adequately reflect those limitations. (Docket no. 15 at 13). Without arguing that the ALJ improperly questioned Mr. Melanson, plaintiff generally contends that hypothetical questions to a vocational expert that fail to account for documented limitations of concentration, persistence, or pace are not substantially justified and analogizes such a failure to the ALJ's alleged failure to accurately reflect all of plaintiff's limitations in his RFC assessment.[20] (Docket no. 15 at 13-14).

---

[19] In the opposition, the Commissioner contends that this argument misconstrues the use of paragraph B criteria as an RFC assessment when in fact they are only used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. (Docket no. 16 at 8). Further, the Commissioner argues that the ALJ provided a detailed assessment of plaintiff's mental limitations at steps 4 and 5 – as required by Ruling 96-8p – by limiting him to routine, repetitive, unskilled work requiring no more than minimal interaction with coworkers and the public, which properly accounted for plaintiff's concentration and social functioning limitations. (Docket no. 16 at 8-9).

[20] In his opposition, the Commissioner argues that the ALJ's hypothetical questions to Mr. Melanson "implicitly accounted for plaintiff's moderate concentration limitations" as the ALJ specifically directed Mr. Melanson to Dr. Walcutt's opinion, which concluded that plaintiff could perform unskilled work despite his limitations. (Docket no. 16 at 11; *see also* AR 34 (hearing transcript in which the ALJ directs Mr. Melanson to "[a]ssume . . . non exertional

28

**The Commissioner's Motion for Summary Judgment and Opposition to Plaintiff's Motion**

The Commissioner first argues that substantial evidence supports the ALJ's finding that plaintiff has the RFC to perform certain unskilled light work; further, the Commissioner argues that the ALJ provided sufficient explanation for his finding regarding plaintiff's RFC. (Docket no. 13 at 11-16; Docket no. 16 at 1-4). As to the objective medical evidence of plaintiff's mental impairments, the Commissioner cites Dr. Kankam's progress notes for the period from 2005-2008 indicating decreased symptoms, improved mood and anxiety, relatively benign mental status examinations, and scores consistent with transient to mild symptoms and Dr. Taller's observations that plaintiff had average attention and concentration, was goal directed and had coherent thought processes, and had no loosening of association or flight of ideas, as well as his diagnosis that plaintiff's bipolar disorder was in partial remission. (Docket no. 13 at 12). Similarly, Dr. Geer-Williams found that plaintiff was "perfectly able to work and be a productive employee for the right position" and that medication "greatly improved" plaintiff's mood swings, awareness, and interaction with others. (*Id.*). The Commissioner also cites Dr. Geer-Williams's findings that plaintiff's periods of depression and mania were "only mild to moderate" and that his difficulties working as an auditor at OPM were "primarily" attributable to his cognitive rather than his mental deficits. (*Id.*). Given that, Dr. Geer-Williams concluded that plaintiff could not work as an auditor at OPM – not that plaintiff was unable to work, as plaintiff contends. (*Id.*). Plaintiff notes that Dr. Geer-Williams later documented plaintiff's "good" and "stable" moods, decreased agitation due to medication, and lack of any significant change in plaintiff's condition as late as July 2009, prior to his hearing before the ALJ. (Docket no. 13 at 12-13).

---

[sic] limitations as set forth in the functional capacity [assessment performed by Dr. Walcutt at AR 479] . . . indicating [] an individual who manages within a basic routine")). Moreover, the Commissioner argues that moderate concentration limitations need not be explicitly included in hypothetical questions where, as here, the vocational expert "independently learned of Plaintiff's moderate concentration limitations when the ALJ specifically directed [Mr. Melanson's] attention to the precise opinion that included those limitations." (Docket no. 16 at 12).

The Commissioner goes on to argue that Dr. Walcutt's opinion substantially supports the ALJ's RFC determination given his opinion that plaintiff could understand, remember, carry out short and simple instructions, remember work-like procedures, sustain an ordinary routine without special supervision, and make simple decisions. (Docket no. 13 at 13). The Commissioner further argues that Dr. Walcutt's opinion is consistent with other evidence in the record, specifically Dr. Geer-Williams's October 2006 letter stating that plaintiff had problems with "*complex* information and procedures." (*Id.*; *see* AR 403).

As to Dr. Geer-Williams's July 2009 letter stating that it was "impossible" for plaintiff to work, the Commissioner argues that the ALJ appropriately afforded this opinion less weight as it is inconsistent with other evidence in the record, including Dr. Geer-Williams's own previous observations and diagnoses. (Docket no. 13 at 13-14). Moreover, the Commissioner asserts that Dr. Geer-Williams mischaracterized both Dr. Horton's and Dr. Fishburne's conclusions and notes that neither concluded plaintiff was unable to work. (Docket no. 13 at 14). Rather, Dr. Horton found only that plaintiff had average intellectual abilities and possible difficulty grasping complex problems, while Dr. Fishburne concluded that plaintiff's impairments affected his ability to work as an auditor at OPM, regardless of whether he was able to receive additional accommodations. (*Id.*). The Commissioner also notes that the conclusions from Drs. Horton and Fishburne were reviewed by Dr. Geer-Williams prior to her observation in October 2006 that plaintiff "is perfectly able to work." (*Id.*; *see* AR 403). The Commissioner similarly argues that the ALJ properly afforded the Psychological Assessment and Mental Residual Functional Capacity Assessment completed by Dr. Abdel-Kader in August 2009 less weight as there was no evidence in the record indicating that Dr. Abdel-Kader treated plaintiff and no support was

provided for Dr. Abdel-Kader's indications that plaintiff suffered from severe (as opposed to moderate or insignificant) limitations in several areas. (Docket no. 13 at 15).

As to plaintiff's physical impairments, the Commissioner argues that the ALJ properly considered plaintiff's credibly established limitations given evidence that plaintiff had difficulty working only because of mental impairments and that the ALJ accordingly restricted plaintiff to light work requiring only occasional postural movements. (Docket no. 13 at 15). The Commissioner also argues that the ALJ's RFC was supported by the evidence given the fact that no physician concluded that plaintiff was disabled due to a physical impairment; the fact that plaintiff did not seek treatment for his knee injury until January 2009, nearly two years after his alleged onset date; Dr. Colley's observation that plaintiff had full range of motion in his legs, normal gait, near-full strength in his right knee and the ability to walk without a cane, bend, and lift light objects; and plaintiff's responsiveness to physical therapy. (Docket no. 13 at 16).

The Commissioner next argues that the ALJ properly considered plaintiff's subjective complaints of difficulty getting along with coworkers, concentrating, and writing audit reports by limiting plaintiff to routine, repetitive, unskilled jobs that require minimal interaction with coworkers and the public. (Docket no. 13 at 16). The Commissioner argues that this is consistent with Social Security rulings 96-9p[21] and 85-15,[22] and 20 C.F.R. Part 404, Subpart P, Appendix 2, as unskilled work requires only the ability to understand, remember, carry out simple instructions, and make simple work-related decisions; respond appropriately to supervision, coworkers, and usual work situations; deal with changes in a routine work setting;

---

[21] S.S.R. 96-9p, 1996 WL 374185, at *9 (1996) (listing the "mental activities . . . generally required by competitive, remunerative, unskilled work").

[22] S.S.R. 85-15, 1985 WL 56857, at *5 (1985) ("Where a person has only a mental impairment but does not have extreme adversities in age, education, and work experience, and does not lack the capacity to do basic work-related activities, the potential occupational base would be reduced by his or her inability to perform certain complexities or particular kinds of work.").

and work primarily with objects rather than data or people. (Docket no. 13 at 16-17). The Commissioner also argues that the ALJ's limitation of plaintiff to light, unskilled work – work at a significantly lower skill level than plaintiff's previous work – is an implicit acceptance of plaintiff's subjective complaints. (Docket no. 13 at 17). As to plaintiff's subjective complaints regarding his knee pain, the Commissioner argues that the ALJ properly determined that these complaints were unsupported by the record given plaintiff's condition following physical therapy and his own testimony that his knee was "much better" as a result of both physical therapy and medication. (*Id.*).

Finally, the Commissioner argues that the evidence submitted by Drs. Geer-Williams and Abdel-Kader to the Appeals Council after the ALJ's decision is neither "new" nor "material" within the meaning of 20 C.F.R. § 404.976(b)(1)[23] and thus cannot serve as a basis for remand. (Docket no. 13 at 18-20). The Commissioner argues that the evidence is not "new" as Dr. Abdel-Kader's February 2010 letter simply restated her August 2009 conclusion that plaintiff could not work without any supporting evidence; moreover, given Dr. Abdel-Kader's statement in the February 2010 letter that she had treated plaintiff since December 2008, the information contained in that letter was available to plaintiff prior to his hearing before the ALJ. (Docket no. 13 at 18-19). Similarly, the Commissioner argues that the information contained in Dr. Geer-Williams's January 2010 "disability evaluation" was accessible to plaintiff prior to his hearing before the ALJ and duplicative of her July 2009 letter which also concluded that plaintiff could not work. (Docket no. 13 at 19).

The Commissioner goes on to argue that this evidence is also not "material" as there is no reasonable possibility that it would alter the ALJ's decision. (*Id.*). Having considered Drs.

---

[23] In pertinent part: "The Appeals Council will consider all the evidence in the administrative law judge hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.976(b)(1).

Geer-Williams's and Abdel-Kader's previous conclusions that plaintiff could not work and affording those conclusions little weight given their lack of support from and inconsistency with the record, the Commissioner argues that it is unreasonable to conclude that the ALJ's decision would be different had he also considered this later, duplicative, and similarly inconsistent and unsupported evidence. (Docket no. 13 at 19-20).

**Substantial Evidence Supports the ALJ's RFC Assessment**

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520(e), (f). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

The ALJ found that plaintiff had the RFC to perform light, unskilled work as defined in 20 C.F.R. § 404.1567(b), specifically conditioning that determination on his limited ability to stoop and climb and limiting him to routine, repetitive, unskilled tasks with little interaction with coworkers or the public. (AR 66). The ALJ's finding took into consideration all of plaintiff's symptoms, objective medical evidence, and opinion evidence in the record. (*Id.*).

Plaintiff argues that the ALJ failed to consider the "expanded list of work-related capacities" that may be affected by plaintiff's mental disorders referenced in Section 12.00, Paragraph A of 20 C.F.R., Part 404, Subpart P, Appendix 1 and failed to include any limitation on concentration, persistence, or pace in his RFC assessment. Thus, plaintiff argues, the ALJ's RFC assessment is not supported by substantial evidence.

Section 12.00, Paragraph C of 20 C.F.R., Part 404, Subpart P, Appendix 1 states in pertinent part:

Assessment of severity. We measure severity according to the functional limitations imposed by your medically determinable mental impairment(s). We assess functional limitations using the four criteria in paragraph B of the listings: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.

In turn, sub-paragraphs 1, 2, 3, and 4 state in pertinent part:

Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

\*                 \*                 \*

Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers . . . You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

\*                 \*                 \*

Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.

\*                 \*                 \*

In work evaluations, concentration, persistence, or pace is assessed by testing your ability to sustain work using appropriate production standards, in either real or simulated work tasks (e.g., filing index cards, locating telephone numbers, or disassembling and reassembling objects). Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or an objective.

\*                 \*                 \*

Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.

(emphasis added).

34

The ALJ began his RFC assessment prior to step 4 by explicitly stating that "the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis" performed at step three.[24] (AR 66). That "degree of limitation" consisted of a "mild restriction" on plaintiff's activities of daily living, given his ability to "run errands, cook, grocery shop, drive, and attend church" and the fact that plaintiff was independent and could meet personal needs; "moderate difficulties" in social functioning, given plaintiff's ability to "relate to others and participate in social events such as church"; "moderate difficulties" with regard to concentration, persistence, or pace, given plaintiff's fluctuating ability to concentrate and pay attention; and plaintiff's one or two episodes of decompensation. (AR 65). Based on those findings, the ALJ determined that plaintiff was able to perform basic work activities at step three. (*Id.*).

At step four, the ALJ went on to find that plaintiff's "[mental] impairments cause limitations and difficulties, but that, even taking into consideration these limitations, the [plaintiff] can perform routine, repetitive, unskilled tasks with little interaction with the public." (AR 67). The ALJ based his decision on plaintiff's own testimony that his symptoms did not cause serious limitations and Dr. Taller's consultative examination for DDS conducted in

---

[24] The critical distinction between consideration of these criteria at different steps of the sequential evaluation process – and the crux of the parties' contentions here – is explained in S.S.R. 96-8p:

> The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

S.S.R. 96-8p, 1996 WL 374184, at *4 (1996).

December 2007.[25] (*Id.*). In that evaluation, Dr. Taller found that plaintiff drove; cared for his own personal needs; went grocery shopping once a week; cleaned his home with his girlfriend; went out to eat; attended church occasionally; watched TV and read every day; occasionally went to public places and feels comfortable around people; occasionally visits with others; gets along with other people and has an average temper; has average concentration and memory; and is able to understand and follow simple instructions independently. (AR 279, 281-82). Dr. Taller also observed that plaintiff initiated most of his activities and was able to comprehend those activities, and that his thought processes were goal-directed and coherent. (AR 278, 279).

Contrary to plaintiff's contention, the ALJ did not "cumulate the Plaintiff's mental impairments into a less-detailed conclusion that the Plaintiff was limited to routine, repetitive, unskilled tasks with little interaction with coworkers or the public." (Docket no. 15 at 12). Rather, the ALJ reviewed plaintiff's testimony and the objective medical evidence in the record – including Dr. Taller's observations regarding plaintiff's activities of daily living, social functioning, and concentration, persistence, and pace – and determined that plaintiff had the RFC to perform unskilled work limited to routine, repetitive, unskilled tasks with little interaction with coworkers or the public. Moreover, the ALJ explicitly rejected the opinions of Dr. Geer-Williams and Dr. Abdel-Kader as inconsistent with the medical record's indication that plaintiff could "function within a basic, repetitive routine." (AR 68). Importantly, that medical record includes Dr. Walcutt's March 2008 PRTF and Summary Conclusions finding that plaintiff could complete a normal workday and workweek without interruptions from psychologically based

---

[25] Under S.S.R. 96-6p, this assessment is entitled to "significant weight": "[T]he administrative law judge or Appeals Council must consider and evaluate any assessment of the individual's RFC by a State agency medical or psychological consultant and by other program physicians or psychologists. At the administrative law judge and Appeals Council levels, RFC assessments by State agency medical or psychological consultants or other program physicians or psychologists are to be considered and addressed in the decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s)." S.S.R. 96-6p, 1996 WL 374180, at *4 (1996).

symptoms and perform at a consistent pace without an unreasonable number or length of rest periods and concluding that plaintiff's RFC "appears compatible with work-related functions equated with competitive employment." (AR 477-78). As noted above, Dr. Walcutt's PRTF specifically addressed the broad categories of work-related activities and criteria set out in paragraphs B and C of 20 C.F.R. Part 404, Subpart P, Appendix 1: he indicated that plaintiff had only mild restrictions on his activities of daily living and moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and one or two extended episodes of decompensation. (AR 473). The ALJ's RFC determination, in turn, took those limitations into consideration when he limited plaintiff to routine, repetitive, unskilled light work with little interaction with coworkers or the public.

Given the foregoing, it is clear that the ALJ considered plaintiff's limitations on concentration, persistence, and pace in making his RFC assessment. Considering the record as a whole and specifically and explicitly referring to Dr. Taller's evaluation of those limitations and their effects on plaintiff's ability to work, the ALJ determined that while such limitations existed, they did not preclude plaintiff from performing routine, repetitive, unskilled tasks. Here, plaintiff's reliance on *Stewart v. Astrue*, 561 F.3d 679 (7th Cir. 2009) is misplaced. First, the question presented in *Stewart* was the availability of attorney's fees under the Equal Access to Justice Act based on an ALJ's contravention of agency regulations and judicial precedent, both in determining RFC and formulating a hypothetical given to a vocational expert. 561 F.3d at 684. Second, the discussion plaintiff cites specifically addresses the requirement that hypothetical questions to a vocational expert must include all limitations supported by medical evidence in the record. *Id.* at 684-85. However, plaintiff does not argue that the ALJ erred in posing questions to Mr. Melanson; rather, plaintiff cites *Stewart* for the proposition that "all

limits on work-related activities resulting from mental impairments must be described in the mental residual functional capacity assessment."[26] (Docket no. 15 at 14).

As discussed above, the ALJ did describe plaintiff's credible mental impairments in his RFC analysis. Moreover, the ALJ also included those limitations in his first hypothetical question to Mr. Melanson, specifically referring to Dr. Walcutt's RFC assessment indicating, *inter alia*, "an individual who manages within a basic routine," has "some limitations reported due to irritability in social domain," but is "[c]apable of negotiating a community." (AR 34-35). Similarly, in his second hypothetical question to Mr. Melanson, the ALJ incorporated his reference in Hypothetical One to the limitations contained in Dr. Walcutt's assessment. (AR 35).[27] It is important to note here that the ALJ *added* a limitation to routine, repetitive, unskilled tasks and little interaction with coworkers and the public to Hypothetical One in formulating Hypothetical Two – he did not *substitute* that limitation for any of the limitations Dr. Walcutt

---

[26] Plaintiff's counsel asked Mr. Melanson to add poor concentration and a moderate limitation following simple work rules consistent to the ALJ's hypothetical questions, and Mr. Melanson answered that if either limitation equated to an 18-20% loss in productivity, both hypothetical individuals could not perform substantial gainful activity. (AR 36-37). Plaintiff's counsel also asked what effect impaired motor strength and speed in the dominant upper extremity would impair the hypothetical individuals' ability to perform the jobs Mr. Melanson identified, and he replied that they would not be able to perform those particular jobs if they were "unable to constantly perform" that work. (AR 38). However, plaintiff offered no evidence at the hearing and there is no evidence in the record to support a finding that plaintiff's limitations in concentration and ability to follow simple work rules consistently in fact equates to an 18-20% loss in productivity. Similarly, the ALJ rejected as incredible any evidence seeming to establish any limitation in plaintiff's use of his hands. (AR 67-68).

[27] While the sufficiency of medical evidence incorporated by reference in hypothetical questions has yet to be directly addressed in the Fourth Circuit, other courts of appeals have held that limiting a claimant to unskilled work adequately accounts for limitations in concentration, persistence, and pace. *See Winschel v. Comm'r of Soc. Sec.* 631 F.3d 1176, 1180 (11th Cir. 2011) ("when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations") (citing *Simila v. Astrue*, 573 F.3d 503, 521-22 (7th Cir. 2009); *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173-76 (9th Cir. 2008); *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001)). *See also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 288 (6th Cir. 2009) (concluding that the ALJ's reference to a moderate limitation in maintaining "attention and concentration" sufficiently represented the claimant's limitations in concentration, persistence, and pace); *Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002) (concluding that a hypothetical question adequately incorporated the claimant's limitations in concentration, persistence, and pace when the ALJ instructed the vocational expert to credit fully medical testimony related to those limitations).

recognized in his RFC assessment previously incorporated in Hypothetical One. (*Id.*). Thus, the ALJ properly considered plaintiff's limitations in concentration, persistence, and pace in both his RFC assessment and his hypothetical questions to Mr. Melanson.

**The ALJ's RFC Assessment is Capable of Meaningful Review**

Plaintiff argues that the Commissioner's final decision defies review because the ALJ did not fulfill his "duty of explanation" when making his RFC determination as he failed to perform a function-by-function assessment of plaintiff's abilities to perform basic work activities ("sitting, standing, walking, lifting, carrying, pushing, pulling, reaching, handling, stooping, and crouching") and failed to consider pertinent evidence relating to plaintiff's knee impairment, Dr. Walcutt's RFC assessment, and evidence submitted by Drs. Horton, Fishburne, and Geer-Williams.

As to plaintiff's first contention, S.S.R. 96-8p does not require the ALJ to produce a detailed statement in writing – a true "function-by-function" analysis. *See Anderson v. Astrue*, 2011 WL 3585390, at *5 (E.D. Va. July 28, 2011) (citing *Banks v. Astrue*, 537 F. Supp. 2d 75, 84-85 (D.D.C. 2008) (finding that a function-by-function analysis of a plaintiff's RFC was not required under S.S.R. 96-8p)). Rather, he "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence" and "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *7 (S.S.A. 1996).

The ALJ considered medical and non-medical evidence in assessing plaintiff's RFC, including medical opinions in the record and plaintiff's own appearance and testimony at the

hearing. The ALJ considered Dr. Walcutt's finding that plaintiff had only moderately limited abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number or length of rest periods. (AR 477-78). The ALJ also considered evidence of plaintiff's multiple affective disorders, his troubles getting along with coworkers, his problems with memory and concentration, his difficulty performing as an OPM auditor, and his problems walking because of his knee. (AR 66-68).

The record established that plaintiff could walk on a level surface for up to an hour and a half, that he could bend and stoop, and that he could lift 10 pounds. (AR 32). To the extent the ALJ determined that plaintiff's symptoms relating to his knee impairment were credible, he limited his RFC assessment to work requiring only occasional stooping and climbing, and no evidence in the record determined credible by the ALJ supports a finding that plaintiff is limited in his ability to sit, carry, push, pull, reach, or handle, particularly given evidence that plaintiff has full grip strength in both upper extremities, a normal gait, and full muscle strength in his hips, thighs, knees, and lower legs. (AR 67-68, 315-22, 490-91). Further, as the Commissioner notes in his opposition to plaintiff's motion, plaintiff makes no argument that he cannot in fact perform light worked as defined in the applicable regulation. (*See* Docket no. 16 at 1).

Importantly, the majority of the ALJ's RFC analysis and discussion centered on the credibility of plaintiff's symptoms in light of objective medical evidence in the record and plaintiff's own testimony. This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Court of Appeals for the Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional

circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Here, the ALJ determined that while plaintiff's mental and physical impairments could reasonably cause his symptoms, those symptoms were not credible to the extent they were inconsistent with evidence indicating his ability to perform light work. (AR 67). Plaintiff previously stated that his mental impairments did not cause serious limitations and he testified that he dressed, shaved, and bathed himself, that he could walk on a level surface for up to an hour and a half, that he could bend and stoop, and that he could lift 10 pounds. (AR 32). Medical evidence showed that plaintiff did not feel hopeless, helpless, or guilty, that he had average abilities to concentrate and remember and average motivation, and that he could follow simple instructions independently. (AR 67). The ALJ also noted medical records indicating that plaintiff's right knee caused him pain when frequently climbing or bending, "but that otherwise he is pain free and his condition is regulated by medication and past therapy." (*Id.*).

If an impairment can be reasonably controlled by treatment or medication it cannot serve as the basis for disability. 20 C.F.R. § 404.1530. In this case, record evidence established that plaintiff received at least two series of Euflexxa injections in 2006 and 2009 and that he underwent a course of physical therapy in 2009 after which he could bend forward, lift light objects, and walk independently without a limp, and plaintiff himself testified that injections and medication alleviated his knee pain. (AR 23-24, 67, 248-57, 484-89). Additionally, both medical evidence and plaintiff's testimony demonstrated that his bipolar disorder was mostly

regulated by medication. (AR 25-27, 345, 347, 401-04). Thus, credible medical evidence cited by the ALJ substantially supports his finding that plaintiff could perform light, unskilled work as defined in the applicable regulations.

The thorough consideration of plaintiff's knee impairment contained in the Commissioner's decision amply refutes any argument that the ALJ failed to consider evidence of that impairment when making his RFC assessment, notwithstanding the ALJ's earlier determination that the impairment was "severe" at step two. As noted above, the ALJ not only considered all of the evidence plaintiff advances in support of his motion, but determined that such evidence was either not credible or entitled to significantly less weight to the extent it was inconsistent with medical evidence in the record indicating that plaintiff could in fact perform light, unskilled work.[28]

Plaintiff's contention that the ALJ did not incorporate all of the limitations Dr. Walcutt identified in his Summary Conclusions mischaracterizes the ALJ's RFC assessment and ignores the significance of those limitations on Dr. Walcutt's opinion of plaintiff's ability to work. Dr. Walcutt determined that plaintiff had *moderate* limitations "in areas dealing w[ith] continuity of performance and adaptation," as summarized above. (AR 477-79). The ALJ, in turn, explicitly considered a number of these limitations in his RFC assessment, including those relating to concentration, memory, interpersonal coordination, performance ability, and motivation. (AR 66-67). Moreover, in *his* RFC, Dr. Walcutt determined that plaintiff was "capable of completing daily living functions within the constraints of the mental conditions" and "manage[d] within a

---

[28] For instance, plaintiff's November 2008 MRI indicating sever degenerative changes in all three compartments, space narrowing and osteophyte formation, and a torn anterior cruciate ligament and January 2009 prescription for a cane – both advanced by plaintiff in support of his motion – are less persuasive in light of later, post-therapy evidence of plaintiff's almost non-existent pain and much-improved ability to walk, stoop, and bend.

basic routine" such that his RFC was "compatible with work-related functions equated with competitive employment." (AR 479).

As to plaintiff's argument that the ALJ failed to consider evidence from Drs. Horton, Fishburne, and Geer-Williams, it should first be noted that there is no requirement that the ALJ discuss each piece of evidence included in the record; moreover, "failure to cite specific evidence does not establish that the ALJ failed to consider it." *Phillips v. Barnhart*, 91 Fed. App'x 775, 780 n.7 (3rd Cir. 2004) ("A written evaluation of every piece of evidence is not required, so long as the ALJ articulated at some minimum level her analysis of a particular line of evidence") (citing *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995)); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted"); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (finding that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection" insufficient to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole).

As to Drs. Horton and Fishburne, both evaluations took place long before plaintiff's alleged onset date in March 2007 and as such need not be considered. *See Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1165 (9th Cir. 2008) ("Medical opinions that predate the alleged onset of disability are of limited relevance"); *McCormick v. Astrue*, 2010 WL 1740712, at *6 (D. Del. April 30, 2010) (rejecting an argument that the ALJ erred in failing to discuss evidence provided by a physician prior to the alleged onset date). Further, to the extent the ALJ did consider their respective evaluations, neither determined that plaintiff could perform no work.

As to Dr. Geer-Williams, it is clear that the ALJ considered her opinion to the extent it was consistent with her own opinions and treatment notes and other medical evidence in the record. In the course of his credibility determination, the ALJ explicitly stated that Dr. Geer-Williams's July 2009 opinion that plaintiff could not work was not entitled to "significant weight" given other evidence in the record indicating that plaintiff could function within a basic, repetitive routine. (AR 68). Given this Court's deference to the credibility determinations of an ALJ, *see Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997), as well as the absence of any duty on the part of the ALJ to cite to each piece of evidence in the record he considered in making that determination, plaintiff's contention that the Commissioner's decision defies review for want of discussion of this medical evidence fails.

Plaintiff's reliance on *See v. Washington Metropolitan Area Transit Authority*, 36 F.3d 375 (4th Cir. 1994) in support of his argument is misplaced. In *See*, the Court of Appeals for the Fourth Circuit reversed and remanded a final decision of the Benefits Review Board, finding that the case took a "curious twist" on remand when "the ALJ erroneously revisited the medical evidence and, without justification or explanation, abandoned his prior findings of [plaintiff's] total disability." *See*, 36 F.3d at 379, 384. The Court of Appeals found this unique lack of explanation by an ALJ particularly egregious given the fact that the case had been remanded for the limited purpose of determining whether suitable alternative employment existed. (*Id.*). Here, by contrast, there is no indication that the ALJ "abandoned" or "rejected" (explicitly or implicitly) any evidence when making his RFC determination. Rather, as explained above and in consideration of the deference this Court owes the ALJ's credibility determination, substantial evidence exists to support the ALJ's RFC assessment and that assessment is capable of meaningful review.

## CONCLUSION

Based on the foregoing analysis, it is the recommendation of the undersigned Magistrate Judge that the Court find that the Commissioner's decision was supported by substantial evidence and that the proper legal standards were applied in evaluating that evidence. Accordingly, the undersigned recommends that plaintiff's motion for summary judgment (Docket no. 14) be DENIED, that the Commissioner's motion for summary judgment (Docket no. 12) be GRANTED, and that the final decision of the Commissioner be AFFIRMED.

## NOTICE

Failure to file written objections to this Report and Recommendation within 14 days after being served with a copy of this Report and Recommendation may result in the waiver of any right to a *de novo* review of this Report and Recommendation and such failure shall bar you from attacking on appeal any finding or conclusion accepted and adopted by the District Judge except upon grounds of plain error.

Entered this 13th day of February, 2012.

/s/ _____

John F. Anderson
United States Magistrate Judge

John F. Anderson
United States Magistrate Judge

Alexandria, VA